**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA — LAS VEGAS DIVISION**

**JOSE DECASTRO,**

Plaintiff,

v.

2:25-cv-02331-CDS-BNW

**JOHN DOE OFFICER 1,**

**JOHN DOE OFFICERS 2–8,**

JOHN DOE SUPERVISING OFFICER, and

**JOHN DOE STATE ACTORS 10–20,**

Defendants.

Case No.: _____

_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
        COUNSEL/PARTIES OF RECORD

NOV 2 1 2025

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

**(42 U.S.C. § 1983)**

**JURY TRIAL DEMANDED**

**INTRODUCTION**

This case concerns three constitutional violations arising from a retaliatory traffic stop on November 22, 2023:

1. A FALSE, STIGMATIZING DATABASE ENTRY indicating Plaintiff has "abrupt tendencies of violence"—a designation without factual basis that appears to be retaliatory viewpoint discrimination against Plaintiff's nationally-recognized police accountability journalism (Fourteenth Amendment "Stigma-Plus" violation);

2. APPLICATION OF "TORTURE CUFFS"—handcuffs applied so tightly that they caused continuous, severe pain for 20-30 minutes during detention (Fourth Amendment excessive force);

3. RETALIATORY SEIZURE of recording equipment to prevent documentation of the encounter (First Amendment retaliation).

Plaintiff is Jose DeCastro, creator of the Delete Lawz YouTube channel (669,000 subscribers, top 0.1% of all YouTube channels). Plaintiff's work documenting police misconduct has been viewed millions of times and is well-known to law enforcement agencies nationwide, including in Nevada. In 2024, Plaintiff was wrongfully convicted and incarcerated by Nevada District Judge Ann Zimmerman for filming police; that conviction was overturned on appeal, vindicating Plaintiff's First Amendment rights. This history provides important context for the present case.

1

Plaintiff brings this action knowing that his conduct during the November 22, 2023 encounter—including the use of profanity and confrontational criticism of law enforcement—will be scrutinized. Plaintiff does not deny this conduct. Rather, Plaintiff asserts that such speech, while perhaps offensive to the officers involved, is constitutionally protected political expression that may not serve as justification for:

- Reliance on false, retaliatory database information;

- Infliction of pain through "torture cuffs"; or

- Confiscation of recording devices.

As the Supreme Court recognized in City of Houston v. Hill, 482 U.S. 451, 461 (1987): "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Plaintiff asserts claims arising under 42 U.S.C. § 1983 and the United States Constitution.

2. Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred within this District.

## PARTIES

3. Plaintiff JOSE DECASTRO is a resident of California and a nationally-recognized civil rights activist, constitutional educator, and journalist. Plaintiff operates the "Delete Lawz" YouTube channel, which has approximately 669,000 subscribers and ranks in the top 0.1% of all YouTube channels globally. Plaintiff's work focuses on Fourth Amendment protections, police accountability, and civil liberties education. Plaintiff's videos documenting police conduct have garnered millions of views and have been widely disseminated across the internet and social media. Nevada law enforcement agencies, including the Las Vegas Metropolitan Police Department and Nevada Highway Patrol, are familiar with Plaintiff's work. At all relevant times, Plaintiff was lawfully present in Nevada and engaged in constitutionally-protected journalistic activity.

4. Defendants JOHN DOE OFFICERS 1–8 were Nevada Highway Patrol officers acting under color of state law during the November 22, 2023 encounter.

5. Defendant JOHN DOE SUPERVISING OFFICER was the on-scene supervisor responsible for directing, authorizing, or affirming Plaintiff's extended detention and application of torture cuffs.

6. Defendants JOHN DOE STATE ACTORS 10–20 are individuals or entities responsible for creating, maintaining, disseminating, or failing to correct the alleged false database entry indicating Plaintiff has "abrupt tendencies of violence." Upon information and belief, this entry was created in retaliation for Plaintiff's protected speech and journalism. CRITICAL: The identity of which law enforcement agency or individual officer created this entry is currently unknown to Plaintiff. The entry could have been created by law enforcement in Nevada, Ohio, Arizona, California, or any other jurisdiction where Plaintiff has engaged in police accountability journalism. The FBI's National Crime Information Center (NCIC) allows law enforcement agencies nationwide to create, modify, and access entries. Discovery of the complete audit trail—including the originating agency, the

individual who created the entry, the date of creation, and the purported justification—is essential to identifying all responsible parties and holding them accountable.

## FACTUAL ALLEGATIONS

### I. THE CONTEXT: PROTECTED POLITICAL SPEECH ABOUT LAW ENFORCEMENT

7. Plaintiff has dedicated his professional work to constitutional rights education, with particular focus on Fourth Amendment protections and police accountability.

8. Plaintiff holds deeply critical views of modern policing practices, particularly regarding traffic enforcement that he views as revenue-generation rather than public safety. These views are expressed through his YouTube channel, which regularly features Plaintiff filming police activity and providing constitutional education.

9. These views are not idiosyncratic. According to Gallup polling data measuring public confidence in institutions:

 • As of 2024, only 51% of Americans express "a great deal" or "quite a lot" of confidence in police—a slim majority, with 49% expressing "some," "very little," or "no" confidence;

 • This represents a rebound from a historic low of 43% confidence in 2023;

 • Among Black Americans, only 24% express confidence in police;

 • Among Americans aged 18-34, only 43% express confidence;

 • According to ABC News/Washington Post polling, only 39% are confident police are adequately trained to avoid excessive force (61% are not confident or have no confidence);

 • Only 41% are confident police treat Black and white people equally (59% are not confident or have no confidence).

10. Plaintiff's critical stance toward law enforcement thus reflects views held by approximately half the American population. His role as a prominent voice for these views makes him a target for retaliation by law enforcement officers who resent accountability journalism.

11. Such criticism, even when expressed through profanity or confrontational language, is constitutionally protected. Cohen v. California, 403 U.S. 15 (1971); City of Houston v. Hill, 482 U.S. 451 (1987); Wood v. Eubanks, 25 F.4th 414 (6th Cir. 2022).

### II. PLAINTIFF'S PATTERN OF VINDICATION AGAINST RETALIATORY PROSECUTION

12. In 2024, Plaintiff was criminally prosecuted in Nevada for filming police activity. Nevada District Judge Ann Zimmerman convicted Plaintiff based on false testimony that Plaintiff failed to back up when ordered to do so by police.

13. Plaintiff appealed the conviction. The appellate court overturned the conviction, finding that Plaintiff had in fact complied with the officer's directive and that the prosecution was based on false testimony.

14. This wrongful conviction and subsequent vindication on appeal garnered widespread media attention, with millions of people viewing coverage of the case across the internet.

15. Nevada judges, prosecutors, and law enforcement officers—including those employed by the Las Vegas Metropolitan Police Department and Nevada Highway Patrol—are aware of Plaintiff's work and his track record of vindicating his constitutional rights.

16. This history demonstrates a pattern of retaliatory law enforcement action against Plaintiff in Nevada, which provides important context for the present case.

### III. THE NOVEMBER 22, 2023 ENCOUNTER

17. On November 22, 2023 (Thanksgiving weekend), Plaintiff was traveling northbound on Interstate-15 toward Las Vegas, Nevada, operating a gray Honda Odyssey.

18. Plaintiff observed multiple Nevada Highway Patrol motorcycle officers conducting traffic enforcement in what appeared to be a revenue-focused operation during a holiday travel period.

19. Plaintiff pulled over and approached officers to express his opinion that such enforcement during Thanksgiving weekend was inappropriate and harmful to families attempting to travel.

20. Plaintiff's initial comments, while critical, were non-violent verbal expression of political opinion about government conduct.

21. An officer warned Plaintiff about turning around in an area marked "authorized vehicles only."

22. Plaintiff argued with the officers about the propriety of their enforcement activities, invoking case law and asserting his rights as a member of the press.

23. The exchange escalated. Plaintiff used profane language and strong criticism of the officers' conduct.

24. Plaintiff acknowledges that his language became confrontational and included profanity. However, Plaintiff at no time:

  • Made physical threats or threatening gestures;

  • Attempted to physically interfere with any arrest or investigation;

  • Blocked traffic or created a safety hazard beyond his verbal criticism;

  • Attempted to flee or physically resist officers.

25. Shortly after this exchange, an officer initiated a traffic stop of Plaintiff's vehicle, citing an alleged illegal U-turn.

26. Upon approach to Plaintiff's vehicle, the confrontational verbal exchange continued, with Plaintiff using profane language to express his view that the stop was retaliatory and improper.

27. Multiple additional officers arrived on scene—ultimately totaling approximately eight (8) motorcycle-unit personnel. This massive response to an alleged traffic violation is consistent with Defendants' recognition of Plaintiff's identity as a prominent police accountability journalist.

### IV. THE DETENTION, FALSE DATABASE JUSTIFICATION, AND TORTURE CUFFS

28. Plaintiff was ordered from his vehicle.

4

29. Plaintiff was placed in handcuffs that were applied extremely tightly to his wrists—what the civil rights community refers to as "torture cuffs," meaning handcuffs applied with unnecessary tightness causing continuous pain, impairment, or injury, beyond what is needed to prevent escape.

30. The handcuffs were applied with such force and tightness that they caused immediate, severe pain.

31. Plaintiff was detained in these torture cuffs for approximately twenty to thirty minutes or longer.

32. Every second that Plaintiff was restrained in the torture cuffs was painful and constituted ongoing physical torment.

33. During this detention, the supervising officer stated that a computer system or database indicated Plaintiff had "abrupt tendencies of violence."

34. Multiple officers referenced or appeared to rely upon this alleged database entry in justifying the extended multi-officer response and the use of torture cuffs.

35. Plaintiff has no criminal history of violence.

36. Plaintiff has no documented history of violent behavior toward law enforcement.

37. Upon information and belief, the "abrupt tendencies of violence" designation is FALSE and was created, maintained, or disseminated:

  • Without factual basis;

  • In retaliation for Plaintiff's protected speech and journalism;

  • As viewpoint-based discrimination against Plaintiff's police accountability work;

  • Without due process.

38. CRITICAL UNKNOWN FACT: The identity of which law enforcement agency or individual created this false entry is currently unknown to Plaintiff and can only be determined through discovery, particularly the FBI NCIC audit trail.

39. The National Crime Information Center (NCIC) is a nationwide database maintained by the FBI that allows law enforcement agencies across all 50 states to enter, modify, access, and disseminate information about individuals.

40. Because Plaintiff's police accountability journalism has taken him to multiple states—including but not limited to California, Nevada, Ohio, Arizona, and others—the false "abrupt tendencies of violence" entry could have been created by:

  • A Nevada law enforcement officer retaliating for Plaintiff's work in Nevada;

  • An Ohio law enforcement officer retaliating for Plaintiff's work in Ohio;

  • An Arizona law enforcement officer retaliating for Plaintiff's work in Arizona;

  • Any other law enforcement agency in any jurisdiction where Plaintiff has documented police conduct.

41. This uncertainty about the entry's origin underscores the constitutional danger of allowing law enforcement to create stigmatizing database entries without notice, hearing, or accountability.

42. Tracking down the source of this false entry through the FBI NCIC audit trail is CRITICAL because:

- It will identify which agency/officer needs to be held accountable;

- It will reveal the date of creation and whether it correlates with specific incidents;

- It may reveal a pattern of retaliatory entries across multiple jurisdictions;

- It will expose whether the entry was based on any factual justification or was purely retaliatory;

- It will show which agencies have accessed and relied upon the false information.

43. Plaintiff was never provided:

- Notice of the database entry prior to detention;

- An opportunity to view or verify the claimed database information;

- Any source documentation supporting the "abrupt tendencies of violence" designation;

- Any administrative or judicial process to challenge the designation;

- Any explanation of how such designation was created or by whom.

## V. CONFISCATION OF RECORDING DEVICE

39. During the detention, Plaintiff was actively recording the encounter with a recording device.

40. Plaintiff's recording device was taken from his hand by officers, terminating his ability to document the encounter.

41. This seizure occurred because officers did not want their conduct documented, not for any legitimate law enforcement or officer safety purpose.

## VI. POST-ENCOUNTER CONSEQUENCES

42. Immediately following release from the torture cuffs, Plaintiff observed visible indentations and marks on his wrists from the excessively tight application.

43. Plaintiff photographed these marks as documentation of the excessive force used against him.

44. Since the incident, Plaintiff has experienced:

- Heightened anxiety when encountering law enforcement;

- Hypervigilance and concern about the false database designation;

- Diminished willingness to engage in recording of police activity;

- Reluctance to exercise his First Amendment rights in ways he previously did;

 • Reputational concern that the false "violent tendencies" designation may affect future encounters with law enforcement;

 • Chilling effect on his journalistic work.

45. The false database entry remains in effect and continues to pose ongoing harm to Plaintiff's liberty interests, reputation, and ability to engage in protected journalism.

46. Given Plaintiff's national profile, the false database designation has been disseminated to law enforcement agencies nationwide, multiplying the harm.

### LEGAL FRAMEWORK: PROTECTED SPEECH VS. ACTIONABLE CONDUCT

47. Plaintiff anticipates that Defendants will argue his confrontational speech and profanity justified their actions.

48. This argument fails as a matter of constitutional law.

49. The Supreme Court has long held that profane criticism of government officials, including police officers, is core political speech protected by the First Amendment. Cohen v. California, 403 U.S. 15, 26 (1971) (holding that "Fuck the Draft" jacket constituted protected speech).

50. In City of Houston v. Hill, 482 U.S. 451, 461 (1987), the Supreme Court specifically addressed police officers' obligation to tolerate criticism: "The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."

51. The Court further explained: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id.

52. Justice Powell's concurring opinion in Cohen v. California established the principle that police officers "may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" 403 U.S. at 25 (Powell, J., concurring).

53. Federal courts have consistently held that even highly offensive profanity directed at police constitutes protected speech:

 • Wood v. Eubanks, 25 F.4th 414 (6th Cir. 2022) (holding that calling officers "bitch ass fucking pigs," "motherfuckers," and "dirty rat bastards" was protected speech);

 • State v. Workman, 2023-Ohio-4510 (Ohio Ct. App. 2023) (reversing disorderly conduct conviction for cursing at police);

 • E.J.J. v. State, 330 P.3d 815 (Wash. 2014) (holding profane criticism of police during investigation was protected speech).

54. These cases recognize that while such speech may be "disrespectful, discourteous and annoying," it is "nonetheless constitutionally protected." E.J.J., 330 P.3d at 819.

55. The critical legal principle is this: Plaintiff's profane criticism of police, while offensive, does not:

 • Justify creation or reliance on false, retaliatory database information;

• Eliminate the Fourth Amendment's protection against torture cuffs;

• Authorize confiscation of recording equipment;

• Negate Plaintiff's due process rights regarding stigmatizing government records.

## CLAIMS FOR RELIEF

## COUNT I

## FOURTEENTH AMENDMENT "STIGMA-PLUS" DUE PROCESS VIOLATION

(False, Retaliatory Government Database Entry + Deprivation of Liberty)

### 42 U.S.C. § 1983

56. Plaintiff incorporates all preceding allegations.

57. The Fourteenth Amendment's Due Process Clause protects individuals from government defamation that both (1) imposes a stigma on reputation and (2) occurs in connection with a deprivation of a protected liberty or property interest. Paul v. Davis, 424 U.S. 693 (1976); Wisconsin v. Constantineau, 400 U.S. 433 (1971).

58. Upon information and belief, one or more Defendants created, maintained, or caused to be created a false database entry indicating Plaintiff has "abrupt tendencies of violence."

59. The identity of the specific law enforcement agency or individual who created this entry is currently unknown and can only be discovered through the FBI NCIC audit trail and subsequent discovery.

60. This designation is FALSE. Plaintiff has no documented history of violent conduct.

61. Upon information and belief, this false designation was created in retaliation for Plaintiff's protected speech and journalism, constituting viewpoint-based discrimination. The entry may have been created by law enforcement in Nevada, Ohio, Arizona, or any other jurisdiction where Plaintiff has engaged in constitutionally-protected police accountability work.

61. This false designation is STIGMATIZING, as it:

• Impugns Plaintiff's character and reputation;

• Suggests Plaintiff poses a danger to law enforcement;

• Affects how law enforcement personnel interact with Plaintiff;

• Has been disseminated to law enforcement agencies nationwide given Plaintiff's prominence;

• Could affect employment, professional relationships, and civic participation.

62. This stigma was coupled with a TANGIBLE DEPRIVATION OF LIBERTY:

• Extended detention (20-30 minutes minimum);

• Physical restraint in torture cuffs causing severe pain;

- Multi-officer response treating Plaintiff as dangerous;

- Ongoing chilling of Plaintiff's First Amendment activities and journalism.

63. Plaintiff was denied procedural due process, including:

- Notice of the database entry;

- Opportunity to be heard;

- Access to supporting documentation;

- Any means to contest the false designation;

- Any post-deprivation remedy.

64. The false database entry continues to exist and poses ongoing harm to Plaintiff's liberty interests, reputation, and professional work.

65. Defendants' actions violated Plaintiff's Fourteenth Amendment right to due process.

## COUNT II

### FOURTH AMENDMENT EXCESSIVE FORCE

("Torture Cuffs")

### 42 U.S.C. § 1983

66. Plaintiff incorporates all preceding allegations.

67. The Fourth Amendment prohibits the use of excessive force during seizures. Graham v. Connor, 490 U.S. 386 (1989).

68. Plaintiff was seized when placed in handcuffs and detained.

69. The Ninth Circuit has long recognized that excessively tight handcuffs constitute excessive force. Wall v. County of Orange, 364 F.3d 1107 (9th Cir. 2004); Palmer v. Sanderson, 9 F.3d 1433 (9th Cir. 1993); Lolli v. County of Orange, 351 F.3d 410 (9th Cir. 2003).

70. The force used against Plaintiff—specifically, the application of "torture cuffs" applied so tightly that they caused continuous severe pain for 20-30 minutes—was excessive under the circumstances.

71. Plaintiff need not prove permanent injury to establish excessive force. The continuous infliction of pain through unnecessarily tight restraints is itself a constitutional violation.

72. The Graham factors demonstrate excessiveness:

- Severity of crime: alleged traffic violation (minimal);

- Immediate threat: Plaintiff posed no physical threat (verbal criticism is not a threat);

- Active resistance or flight: Plaintiff did not physically resist or attempt to flee;

• Need for force: False database entry does not justify torture cuffs when subject is verbally compliant with physical directives;

• Duration: 20-30 minutes of continuous pain was unreasonable.

73. The visible marks left on Plaintiff's wrists—documented through photographs—evidence the excessive tightness of the restraints.

74. A reasonable officer would not have applied restraints so tightly as to cause continuous severe pain under these circumstances.

75. Defendants' use of torture cuffs violated Plaintiff's Fourth Amendment right to be free from excessive force.

**COUNT III**

**FIRST AMENDMENT RETALIATION**

**42 U.S.C. § 1983**

76. Plaintiff incorporates all preceding allegations.

77. The First Amendment protects the right to criticize government officials, including police officers, and the right to record police activity in public spaces. Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011); City of Houston v. Hill, 482 U.S. 451 (1987).

78. Plaintiff engaged in protected activity by:

• Verbally criticizing police enforcement activities;

• Recording police activity;

• Expressing his political views about law enforcement practices;

• Engaging in journalism as creator of a prominent police accountability channel.

79. Defendants took adverse action by:

• Initiating a traffic stop immediately after Plaintiff's criticism;

• Confiscating Plaintiff's recording device;

• Extending detention beyond what would be reasonable for a traffic violation;

• Summoning eight officers to respond to an alleged U-turn;

• Applying torture cuffs.

80. A causal connection exists between Plaintiff's protected speech and Defendants' actions:

• The traffic stop occurred immediately after Plaintiff's criticism;

• Officers were aware of Plaintiff's national prominence as police accountability journalist;

• The recording device was seized to prevent documentation;

• The extended detention and multi-officer response was grossly disproportionate to an alleged U-turn violation;

• The false database entry appears to be viewpoint-based retaliation.

81. Defendants' actions would deter a person of ordinary firmness from engaging in protected speech and recording activity.

82. Defendants' actions violated Plaintiff's First Amendment rights.

## COUNT IV

### DECLARATORY AND INJUNCTIVE RELIEF

(Database Correction)

83. Plaintiff incorporates all preceding allegations.

84. Plaintiff seeks declaratory judgment that the database entry indicating "abrupt tendencies of violence" is false, retaliatory, and violates his constitutional rights.

85. Plaintiff seeks injunctive relief requiring:

• Removal or correction of the false database entry;

• Disclosure of the source and basis for the entry;

• Notice to all law enforcement agencies to which the false information was disseminated;

• Implementation of procedures to prevent future due process violations through unchallenged, retaliatory database designations.

86. Plaintiff has no adequate remedy at law, as monetary damages cannot undo the ongoing reputational harm and liberty deprivation caused by the false database entry.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all counts;

B. Enter a declaratory judgment that:

  1. The database entry indicating Plaintiff has "abrupt tendencies of violence" is false, retaliatory, and violates the Fourteenth Amendment;

  2. Defendants violated Plaintiff's Fourth Amendment rights through use of torture cuffs;

  3. Defendants violated Plaintiff's First Amendment rights through retaliation;

C. Enter injunctive relief requiring:

1. Removal or correction of the false database entry;

2. Disclosure of the entry's complete source, including:

   a. The specific law enforcement agency that created the entry;

   b. The identity of the individual who created the entry;

   c. The date of creation;

   d. The purported factual basis or justification;

   e. Complete audit trail of all access and modifications;

3. Notice to all agencies to which the false information was disseminated;

4. Implementation of due process procedures for individuals to challenge false NCIC entries;

D. Award compensatory damages in an amount to be proven at trial;

E. Award punitive damages against individual defendants in their personal capacities;

F. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988;

G. Award pre-judgment and post-judgment interest as allowed by law;

H. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all triable claims.

Dated: November 18, 2025

Respectfully submitted,

_____

Jose DeCastro, Pro Se

5350 Wilshire Blvd., PO Box 36143

Los Angeles, CA 90036

Email: Chille@situationcreator.com

Phone: (310) 963-2445

12

1. Removal or correction of the false database entry;

2. Disclosure of the entry's complete source, including:

   a. The specific law enforcement agency that created the entry;

   b. The identity of the individual who created the entry;

   c. The date of creation;

   d. The purported factual basis or justification;

   e. Complete audit trail of all access and modifications;

3. Notice to all agencies to which the false information was disseminated;

4. Implementation of due process procedures for individuals to challenge false NCIC entries;

D. Award compensatory damages in an amount to be proven at trial;

E. Award punitive damages against individual defendants in their personal capacities;

F. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988;

G. Award pre-judgment and post-judgment interest as allowed by law;

H. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all triable claims.

Dated: November 18, 2025

Respectfully submitted,

Jose DeCastro, Pro Se

5350 Wilshire Blvd., PO Box 36143

Los Angeles, CA 90036

Email: Chille@situationcreator.com

Phone: (310) 963-2445

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA — LAS VEGAS DIVISION

## JOSE DECASTRO,

Plaintiff,

v.

## JOHN DOE OFFICER 1,

## JOHN DOE OFFICERS 2–8,

JOHN DOE SUPERVISING OFFICER, and

## JOHN DOE STATE ACTORS 10–20,

Defendants.

Case No.: _____

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## (42 U.S.C. § 1983)

## JURY TRIAL DEMANDED

## INTRODUCTION

This case concerns three constitutional violations arising from a retaliatory traffic stop on November 22, 2023:

1. A FALSE, STIGMATIZING DATABASE ENTRY indicating Plaintiff has "abrupt tendencies of violence"—a designation without factual basis that appears to be retaliatory viewpoint discrimination against Plaintiff's nationally-recognized police accountability journalism (Fourteenth Amendment "Stigma-Plus" violation);

2. APPLICATION OF "TORTURE CUFFS"—handcuffs applied so tightly that they caused continuous, severe pain for 20-30 minutes during detention (Fourth Amendment excessive force);

3. RETALIATORY SEIZURE of recording equipment to prevent documentation of the encounter (First Amendment retaliation).

Plaintiff is Jose DeCastro, creator of the Delete Lawz YouTube channel (669,000 subscribers, top 0.1% of all YouTube channels). Plaintiff's work documenting police misconduct has been viewed millions of times and is well-known to law enforcement agencies nationwide, including in Nevada. In 2024, Plaintiff was wrongfully convicted and incarcerated by Nevada District Judge Ann Zimmerman for filming police; that conviction was overturned on appeal, vindicating Plaintiff's First Amendment rights. This history provides important context for the present case.

1

Plaintiff brings this action knowing that his conduct during the November 22, 2023 encounter—including the use of profanity and confrontational criticism of law enforcement—will be scrutinized. Plaintiff does not deny this conduct. Rather, Plaintiff asserts that such speech, while perhaps offensive to the officers involved, is constitutionally protected political expression that may not serve as justification for:

- Reliance on false, retaliatory database information;

- Infliction of pain through "torture cuffs"; or

- Confiscation of recording devices.

As the Supreme Court recognized in City of Houston v. Hill, 482 U.S. 451, 461 (1987): "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Plaintiff asserts claims arising under 42 U.S.C. § 1983 and the United States Constitution.

2. Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to these claims occurred within this District.

## PARTIES

3. Plaintiff JOSE DECASTRO is a resident of California and a nationally-recognized civil rights activist, constitutional educator, and journalist. Plaintiff operates the "Delete Lawz" YouTube channel, which has approximately 669,000 subscribers and ranks in the top 0.1% of all YouTube channels globally. Plaintiff's work focuses on Fourth Amendment protections, police accountability, and civil liberties education. Plaintiff's videos documenting police conduct have garnered millions of views and have been widely disseminated across the internet and social media. Nevada law enforcement agencies, including the Las Vegas Metropolitan Police Department and Nevada Highway Patrol, are familiar with Plaintiff's work. At all relevant times, Plaintiff was lawfully present in Nevada and engaged in constitutionally-protected journalistic activity.

4. Defendants JOHN DOE OFFICERS 1–8 were Nevada Highway Patrol officers acting under color of state law during the November 22, 2023 encounter.

5. Defendant JOHN DOE SUPERVISING OFFICER was the on-scene supervisor responsible for directing, authorizing, or affirming Plaintiff's extended detention and application of torture cuffs.

6. Defendants JOHN DOE STATE ACTORS 10–20 are individuals or entities responsible for creating, maintaining, disseminating, or failing to correct the alleged false database entry indicating Plaintiff has "abrupt tendencies of violence." Upon information and belief, this entry was created in retaliation for Plaintiff's protected speech and journalism. CRITICAL: The identity of which law enforcement agency or individual officer created this entry is currently unknown to Plaintiff. The entry could have been created by law enforcement in Nevada, Ohio, Arizona, California, or any other jurisdiction where Plaintiff has engaged in police accountability journalism. The FBI's National Crime Information Center (NCIC) allows law enforcement agencies nationwide to create, modify, and access entries. Discovery of the complete audit trail—including the originating agency, the

individual who created the entry, the date of creation, and the purported justification—is essential to identifying all responsible parties and holding them accountable.

## FACTUAL ALLEGATIONS

### I. THE CONTEXT: PROTECTED POLITICAL SPEECH ABOUT LAW ENFORCEMENT

7. Plaintiff has dedicated his professional work to constitutional rights education, with particular focus on Fourth Amendment protections and police accountability.

8. Plaintiff holds deeply critical views of modern policing practices, particularly regarding traffic enforcement that he views as revenue-generation rather than public safety. These views are expressed through his YouTube channel, which regularly features Plaintiff filming police activity and providing constitutional education.

9. These views are not idiosyncratic. According to Gallup polling data measuring public confidence in institutions:

   • As of 2024, only 51% of Americans express "a great deal" or "quite a lot" of confidence in police—a slim majority, with 49% expressing "some," "very little," or "no" confidence;

   • This represents a rebound from a historic low of 43% confidence in 2023;

   • Among Black Americans, only 24% express confidence in police;

   • Among Americans aged 18-34, only 43% express confidence;

   • According to ABC News/Washington Post polling, only 39% are confident police are adequately trained to avoid excessive force (61% are not confident or have no confidence);

   • Only 41% are confident police treat Black and white people equally (59% are not confident or have no confidence).

10. Plaintiff's critical stance toward law enforcement thus reflects views held by approximately half the American population. His role as a prominent voice for these views makes him a target for retaliation by law enforcement officers who resent accountability journalism.

11. Such criticism, even when expressed through profanity or confrontational language, is constitutionally protected. Cohen v. California, 403 U.S. 15 (1971); City of Houston v. Hill, 482 U.S. 451 (1987); Wood v. Eubanks, 25 F.4th 414 (6th Cir. 2022).

### II. PLAINTIFF'S PATTERN OF VINDICATION AGAINST RETALIATORY PROSECUTION

12. In 2024, Plaintiff was criminally prosecuted in Nevada for filming police activity. Nevada District Judge Ann Zimmerman convicted Plaintiff based on false testimony that Plaintiff failed to back up when ordered to do so by police.

13. Plaintiff appealed the conviction. The appellate court overturned the conviction, finding that Plaintiff had in fact complied with the officer's directive and that the prosecution was based on false testimony.

14. This wrongful conviction and subsequent vindication on appeal garnered widespread media attention, with millions of people viewing coverage of the case across the internet.

3

15. Nevada judges, prosecutors, and law enforcement officers—including those employed by the Las Vegas Metropolitan Police Department and Nevada Highway Patrol—are aware of Plaintiff's work and his track record of vindicating his constitutional rights.

16. This history demonstrates a pattern of retaliatory law enforcement action against Plaintiff in Nevada, which provides important context for the present case.

### III. THE NOVEMBER 22, 2023 ENCOUNTER

17. On November 22, 2023 (Thanksgiving weekend), Plaintiff was traveling northbound on Interstate-15 toward Las Vegas, Nevada, operating a gray Honda Odyssey.

18. Plaintiff observed multiple Nevada Highway Patrol motorcycle officers conducting traffic enforcement in what appeared to be a revenue-focused operation during a holiday travel period.

19. Plaintiff pulled over and approached officers to express his opinion that such enforcement during Thanksgiving weekend was inappropriate and harmful to families attempting to travel.

20. Plaintiff's initial comments, while critical, were non-violent verbal expression of political opinion about government conduct.

21. An officer warned Plaintiff about turning around in an area marked "authorized vehicles only."

22. Plaintiff argued with the officers about the propriety of their enforcement activities, invoking case law and asserting his rights as a member of the press.

23. The exchange escalated. Plaintiff used profane language and strong criticism of the officers' conduct.

24. Plaintiff acknowledges that his language became confrontational and included profanity. However, Plaintiff at no time:

   • Made physical threats or threatening gestures;

   • Attempted to physically interfere with any arrest or investigation;

   • Blocked traffic or created a safety hazard beyond his verbal criticism;

   • Attempted to flee or physically resist officers.

25. Shortly after this exchange, an officer initiated a traffic stop of Plaintiff's vehicle, citing an alleged illegal U-turn.

26. Upon approach to Plaintiff's vehicle, the confrontational verbal exchange continued, with Plaintiff using profane language to express his view that the stop was retaliatory and improper.

27. Multiple additional officers arrived on scene—ultimately totaling approximately eight (8) motorcycle-unit personnel. This massive response to an alleged traffic violation is consistent with Defendants' recognition of Plaintiff's identity as a prominent police accountability journalist.

### IV. THE DETENTION, FALSE DATABASE JUSTIFICATION, AND TORTURE CUFFS

28. Plaintiff was ordered from his vehicle.

4

29. Plaintiff was placed in handcuffs that were applied extremely tightly to his wrists—what the civil rights community refers to as "torture cuffs," meaning handcuffs applied with unnecessary tightness causing continuous pain, impairment, or injury, beyond what is needed to prevent escape.

30. The handcuffs were applied with such force and tightness that they caused immediate, severe pain.

31. Plaintiff was detained in these torture cuffs for approximately twenty to thirty minutes or longer.

32. Every second that Plaintiff was restrained in the torture cuffs was painful and constituted ongoing physical torment.

33. During this detention, the supervising officer stated that a computer system or database indicated Plaintiff had "abrupt tendencies of violence."

34. Multiple officers referenced or appeared to rely upon this alleged database entry in justifying the extended multi-officer response and the use of torture cuffs.

35. Plaintiff has no criminal history of violence.

36. Plaintiff has no documented history of violent behavior toward law enforcement.

37. Upon information and belief, the "abrupt tendencies of violence" designation is FALSE and was created, maintained, or disseminated:

  • Without factual basis;

  • In retaliation for Plaintiff's protected speech and journalism;

  • As viewpoint-based discrimination against Plaintiff's police accountability work;

  • Without due process.

38. CRITICAL UNKNOWN FACT: The identity of which law enforcement agency or individual created this false entry is currently unknown to Plaintiff and can only be determined through discovery, particularly the FBI NCIC audit trail.

39. The National Crime Information Center (NCIC) is a nationwide database maintained by the FBI that allows law enforcement agencies across all 50 states to enter, modify, access, and disseminate information about individuals.

40. Because Plaintiff's police accountability journalism has taken him to multiple states—including but not limited to California, Nevada, Ohio, Arizona, and others—the false "abrupt tendencies of violence" entry could have been created by:

  • A Nevada law enforcement officer retaliating for Plaintiff's work in Nevada;

  • An Ohio law enforcement officer retaliating for Plaintiff's work in Ohio;

  • An Arizona law enforcement officer retaliating for Plaintiff's work in Arizona;

  • Any other law enforcement agency in any jurisdiction where Plaintiff has documented police conduct.

41. This uncertainty about the entry's origin underscores the constitutional danger of allowing law enforcement to create stigmatizing database entries without notice, hearing, or accountability.

42. Tracking down the source of this false entry through the FBI NCIC audit trail is CRITICAL because:

- It will identify which agency/officer needs to be held accountable;

- It will reveal the date of creation and whether it correlates with specific incidents;

- It may reveal a pattern of retaliatory entries across multiple jurisdictions;

- It will expose whether the entry was based on any factual justification or was purely retaliatory;

- It will show which agencies have accessed and relied upon the false information.

43. Plaintiff was never provided:

- Notice of the database entry prior to detention;

- An opportunity to view or verify the claimed database information;

- Any source documentation supporting the "abrupt tendencies of violence" designation;

- Any administrative or judicial process to challenge the designation;

- Any explanation of how such designation was created or by whom.

## V. CONFISCATION OF RECORDING DEVICE

39. During the detention, Plaintiff was actively recording the encounter with a recording device.

40. Plaintiff's recording device was taken from his hand by officers, terminating his ability to document the encounter.

41. This seizure occurred because officers did not want their conduct documented, not for any legitimate law enforcement or officer safety purpose.

## VI. POST-ENCOUNTER CONSEQUENCES

42. Immediately following release from the torture cuffs, Plaintiff observed visible indentations and marks on his wrists from the excessively tight application.

43. Plaintiff photographed these marks as documentation of the excessive force used against him.

44. Since the incident, Plaintiff has experienced:

- Heightened anxiety when encountering law enforcement;

- Hypervigilance and concern about the false database designation;

- Diminished willingness to engage in recording of police activity;

- Reluctance to exercise his First Amendment rights in ways he previously did;

6

• Reputational concern that the false "violent tendencies" designation may affect future encounters with law enforcement;

• Chilling effect on his journalistic work.

45. The false database entry remains in effect and continues to pose ongoing harm to Plaintiff's liberty interests, reputation, and ability to engage in protected journalism.

46. Given Plaintiff's national profile, the false database designation has been disseminated to law enforcement agencies nationwide, multiplying the harm.

## LEGAL FRAMEWORK: PROTECTED SPEECH VS. ACTIONABLE CONDUCT

47. Plaintiff anticipates that Defendants will argue his confrontational speech and profanity justified their actions.

48. This argument fails as a matter of constitutional law.

49. The Supreme Court has long held that profane criticism of government officials, including police officers, is core political speech protected by the First Amendment. Cohen v. California, 403 U.S. 15, 26 (1971) (holding that "Fuck the Draft" jacket constituted protected speech).

50. In City of Houston v. Hill, 482 U.S. 451, 461 (1987), the Supreme Court specifically addressed police officers' obligation to tolerate criticism: "The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."

51. The Court further explained: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id.

52. Justice Powell's concurring opinion in Cohen v. California established the principle that police officers "may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" 403 U.S. at 25 (Powell, J., concurring).

53. Federal courts have consistently held that even highly offensive profanity directed at police constitutes protected speech:

• Wood v. Eubanks, 25 F.4th 414 (6th Cir. 2022) (holding that calling officers "bitch ass fucking pigs," "motherfuckers," and "dirty rat bastards" was protected speech);

• State v. Workman, 2023-Ohio-4510 (Ohio Ct. App. 2023) (reversing disorderly conduct conviction for cursing at police);

• E.J.J. v. State, 330 P.3d 815 (Wash. 2014) (holding profane criticism of police during investigation was protected speech).

54. These cases recognize that while such speech may be "disrespectful, discourteous and annoying," it is "nonetheless constitutionally protected." E.J.J., 330 P.3d at 819.

55. The critical legal principle is this: Plaintiff's profane criticism of police, while offensive, does not:

• Justify creation or reliance on false, retaliatory database information;

• Eliminate the Fourth Amendment's protection against torture cuffs;

• Authorize confiscation of recording equipment;

• Negate Plaintiff's due process rights regarding stigmatizing government records.

## CLAIMS FOR RELIEF

## COUNT I

## FOURTEENTH AMENDMENT "STIGMA-PLUS" DUE PROCESS VIOLATION

(False, Retaliatory Government Database Entry + Deprivation of Liberty)

### 42 U.S.C. § 1983

56. Plaintiff incorporates all preceding allegations.

57. The Fourteenth Amendment's Due Process Clause protects individuals from government defamation that both (1) imposes a stigma on reputation and (2) occurs in connection with a deprivation of a protected liberty or property interest. Paul v. Davis, 424 U.S. 693 (1976); Wisconsin v. Constantineau, 400 U.S. 433 (1971).

58. Upon information and belief, one or more Defendants created, maintained, or caused to be created a false database entry indicating Plaintiff has "abrupt tendencies of violence."

59. The identity of the specific law enforcement agency or individual who created this entry is currently unknown and can only be discovered through the FBI NCIC audit trail and subsequent discovery.

60. This designation is FALSE. Plaintiff has no documented history of violent conduct.

61. Upon information and belief, this false designation was created in retaliation for Plaintiff's protected speech and journalism, constituting viewpoint-based discrimination. The entry may have been created by law enforcement in Nevada, Ohio, Arizona, or any other jurisdiction where Plaintiff has engaged in constitutionally-protected police accountability work.

61. This false designation is STIGMATIZING, as it:

• Impugns Plaintiff's character and reputation;

• Suggests Plaintiff poses a danger to law enforcement;

• Affects how law enforcement personnel interact with Plaintiff;

• Has been disseminated to law enforcement agencies nationwide given Plaintiff's prominence;

• Could affect employment, professional relationships, and civic participation.

62. This stigma was coupled with a TANGIBLE DEPRIVATION OF LIBERTY:

• Extended detention (20-30 minutes minimum);

• Physical restraint in torture cuffs causing severe pain;

- Multi-officer response treating Plaintiff as dangerous;

- Ongoing chilling of Plaintiff's First Amendment activities and journalism.

63. Plaintiff was denied procedural due process, including:

- Notice of the database entry;

- Opportunity to be heard;

- Access to supporting documentation;

- Any means to contest the false designation;

- Any post-deprivation remedy.

64. The false database entry continues to exist and poses ongoing harm to Plaintiff's liberty interests, reputation, and professional work.

65. Defendants' actions violated Plaintiff's Fourteenth Amendment right to due process.

## COUNT II

### FOURTH AMENDMENT EXCESSIVE FORCE

("Torture Cuffs")

### 42 U.S.C. § 1983

66. Plaintiff incorporates all preceding allegations.

67. The Fourth Amendment prohibits the use of excessive force during seizures. Graham v. Connor, 490 U.S. 386 (1989).

68. Plaintiff was seized when placed in handcuffs and detained.

69. The Ninth Circuit has long recognized that excessively tight handcuffs constitute excessive force. Wall v. County of Orange, 364 F.3d 1107 (9th Cir. 2004); Palmer v. Sanderson, 9 F.3d 1433 (9th Cir. 1993); Lolli v. County of Orange, 351 F.3d 410 (9th Cir. 2003).

70. The force used against Plaintiff—specifically, the application of "torture cuffs" applied so tightly that they caused continuous severe pain for 20-30 minutes—was excessive under the circumstances.

71. Plaintiff need not prove permanent injury to establish excessive force. The continuous infliction of pain through unnecessarily tight restraints is itself a constitutional violation.

72. The Graham factors demonstrate excessiveness:

- Severity of crime: alleged traffic violation (minimal);

- Immediate threat: Plaintiff posed no physical threat (verbal criticism is not a threat);

- Active resistance or flight: Plaintiff did not physically resist or attempt to flee;

• Need for force: False database entry does not justify torture cuffs when subject is verbally compliant with physical directives;

• Duration: 20-30 minutes of continuous pain was unreasonable.

73. The visible marks left on Plaintiff's wrists—documented through photographs—evidence the excessive tightness of the restraints.

74. A reasonable officer would not have applied restraints so tightly as to cause continuous severe pain under these circumstances.

75. Defendants' use of torture cuffs violated Plaintiff's Fourth Amendment right to be free from excessive force.

## COUNT III

### FIRST AMENDMENT RETALIATION

### 42 U.S.C. § 1983

76. Plaintiff incorporates all preceding allegations.

77. The First Amendment protects the right to criticize government officials, including police officers, and the right to record police activity in public spaces. Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011); City of Houston v. Hill, 482 U.S. 451 (1987).

78. Plaintiff engaged in protected activity by:

• Verbally criticizing police enforcement activities;

• Recording police activity;

• Expressing his political views about law enforcement practices;

• Engaging in journalism as creator of a prominent police accountability channel.

79. Defendants took adverse action by:

• Initiating a traffic stop immediately after Plaintiff's criticism;

• Confiscating Plaintiff's recording device;

• Extending detention beyond what would be reasonable for a traffic violation;

• Summoning eight officers to respond to an alleged U-turn;

• Applying torture cuffs.

80. A causal connection exists between Plaintiff's protected speech and Defendants' actions:

• The traffic stop occurred immediately after Plaintiff's criticism;

• Officers were aware of Plaintiff's national prominence as police accountability journalist;

• The recording device was seized to prevent documentation;

• The extended detention and multi-officer response was grossly disproportionate to an alleged U-turn violation;

• The false database entry appears to be viewpoint-based retaliation.

81. Defendants' actions would deter a person of ordinary firmness from engaging in protected speech and recording activity.

82. Defendants' actions violated Plaintiff's First Amendment rights.

## COUNT IV

## DECLARATORY AND INJUNCTIVE RELIEF

(Database Correction)

83. Plaintiff incorporates all preceding allegations.

84. Plaintiff seeks declaratory judgment that the database entry indicating "abrupt tendencies of violence" is false, retaliatory, and violates his constitutional rights.

85. Plaintiff seeks injunctive relief requiring:

• Removal or correction of the false database entry;

• Disclosure of the source and basis for the entry;

• Notice to all law enforcement agencies to which the false information was disseminated;

• Implementation of procedures to prevent future due process violations through unchallenged, retaliatory database designations.

86. Plaintiff has no adequate remedy at law, as monetary damages cannot undo the ongoing reputational harm and liberty deprivation caused by the false database entry.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all counts;

B. Enter a declaratory judgment that:

1. The database entry indicating Plaintiff has "abrupt tendencies of violence" is false, retaliatory, and violates the Fourteenth Amendment;

2. Defendants violated Plaintiff's Fourth Amendment rights through use of torture cuffs;

3. Defendants violated Plaintiff's First Amendment rights through retaliation;

C. Enter injunctive relief requiring:

11

1. Removal or correction of the false database entry;

2. Disclosure of the entry's complete source, including:

   a. The specific law enforcement agency that created the entry;

   b. The identity of the individual who created the entry;

   c. The date of creation;

   d. The purported factual basis or justification;

   e. Complete audit trail of all access and modifications;

3. Notice to all agencies to which the false information was disseminated;

4. Implementation of due process procedures for individuals to challenge false NCIC entries;

D. Award compensatory damages in an amount to be proven at trial;

E. Award punitive damages against individual defendants in their personal capacities;

F. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988;

G. Award pre-judgment and post-judgment interest as allowed by law;

H. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all triable claims.

Dated: November 18, 2025

Respectfully submitted,

_____

Jose DeCastro, Pro Se

5350 Wilshire Blvd., PO Box 36143

Los Angeles, CA 90036

Email: Chille@situationcreator.com

Phone: (310) 963-2445

12



TO:

FED Court
Clerk of Court
333 S. LV Blvd
Las Vegas NV
87101

FROM:

Jose DeCastro
12ST Franklin
Santa Monica
CA 90904

FILED
ENTERED _____ RECEIVED
_____ SERVED ON
COUNSEL/PARTIES OF RECORD

NOV 21 2025

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

Utility Mailer
10 1/2" x 16"

CERTI
PLACE STICK
OF THE FIE